```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X
UNITED STATES OF AMERICA,


          -against-                      ORDER AND MEMORANDUM
                                            05-CR-601 (DRH)
DEREK TURNER,


              Defendant.
-----------------------------X
A P P E A R A N C E S:

For the Government:
     Benton J. Campbell
     United States Attorney
     100 Federal Plaza
     Central Islip, New York 11722
        By: Nicole Boeckman, A.U.S.A.
            Diane Beckmann, A.U.S.A.

For Defendant:
     James C. Neville, Esq.
     14 Vanderventer Avenue
     P.O. Box 1711
     Port Washington, New York 11050

HURLEY, Senior District Judge
```

<u>QUESTION PRESENTED</u>

The question before the Court concerns under what circumstances may the defrauding of foreign victims by a foreign defendant, operating overseas, be considered relevant conduct under U.S.S.G. § 1B1.3(a)(2) for guideline calculation purposes following that defendant's conviction for wire fraud involving United States citizens as part of the same continuing course of conduct.

<u>BACKGROUND</u>

On August 9, 2005, Derek Turner ("defendant" or "Turner") pled guilty, pursuant to a plea agreement, before

District Judge Joanna Seybert of this Court to Counts One, Two, and Three of a three count information. Each of those counts charged the defendant with committing wire fraud between February 2001 and April 16, 2005 by sending false financial account statements by facsimile to a John Doe in violation of 18 U.S.C. § 1343.

The defendant was sentenced on February 16, 2006 by Judge Seybert to a sentence which included a period of incarceration of 240 months on each of the counts of conviction, to run concurrently. The case was then appealed to the Second Circuit which, by summary order dated December 17, 2007, remanded the case to the district court for de novo resentencing following the government's acknowledgment that "it violated the plea agreement at least three times when it sought more severe punishment than that anticipated by the plea agreement." United States v. Turner, 258 Fed. Appx. 360, 360 (2d Cir. Dec. 17, 2007). The remand was coupled with a direction, consistent with the Circuit's standard practice in such matters, that the case be randomly assigned to another district court judge "because the effect of the government's breach of the plea agreement is too difficult to erase if the case stays before the same judge."[1]

---

[1] In directing reassignment upon remand to another district judge, the Circuit ascribed fault solely to the government absent "even the slightest criticism of the [initial] district judge." Turner, 258 Fed. Appx. at 361 n.2.

Id. at 361 n.2. As a result of that process, the case is now before me with the government's prior offending communications having been culled from the sentencing materials.

There are a number of resentencing issues to be addressed. However, counsel have requested that I begin the process by determining whether defendant's foreign conduct constitutes relevant conduct under U.S.S.G. § 1B1.3. If it does, the probation department's calculation of the applicable advisory guidelines range exceeds the statutory maximum for the counts of conviction, to wit 20 years. Defendant maintains that his foreign activities involving purported foreign victims[2] - committed while he was a citizen of New Zealand, located in the Bahamas and with no "U.S. Status" (Sept. 13, 2005 Presentence Report ("PSR") at 2) — should be deleted from the analysis, thus producing, in his view, an advisory guideline range of 41 to 51 months.

By way of background, the government maintains that defendant created bogus hedge funds in Australia in 1999 — viz.

---

[2] Defendant reports, and the government does not contend otherwise, that "Derek Turner has not been charged with any crimes by authorities in the Bahamas, Australia, or New Zealand." (Def.'s Sept. 5, 2008 Letter Br. at 3 n.1.) Parenthetically, for foreign conduct to be relevant for § 1B1.3 purposes it must be criminal. See, e.g., United States v. Dove, 247 F.3d 152, 159-60 (4th Cir. 2001) and United States v. Schaefer, 291 F.3d 932, 939-40 (7th Cir. 2002); cf. United States v. Silkowski, 32 F.3d 682, 687 (2d Cir. 1994).

"Turning Investments Pty Ltd" and "Turning Holdings Pty Limited" — and directed investors, principally Australians and New Zealanders, to send their money to bank accounts at the Commonwealth Bank of Australia controlled by Turner. In order to entice investors, Turner claimed that he utilized a sophisticated trading technique, the so called "Gann Method," which purportedly minimized risk and enhanced returns. He also grossly exaggerated the amount of funds under his control, as well as the rate of return realized on those funds. Those that invested were initially furnished with investment certificates signed by defendant as "Director" and thereafter received periodic account statements containing material misrepresentations.

After encountering difficulties with the Australian Securities and Investments Commission ("ASIC") in May of 2000, Turner relocated his operation to the Bahamas - utilizing the name "Turning International Limited" - along with the funds on deposit in the Australian bank. From there, he began to solicit individuals from throughout the world, including the United States using essentially the same modus operandi employed in Australia.

Defendant's victimization of individuals in the United States provided the predicate for the three count information to which he pled guilty. His allocution at the time of the plea was as follows:

In or about and between February 2001 through
and including April 15, 2005, I was
the owner of Turner International Limited,
which was located in Nassau, the Bahamas.

Turner International, also known as The
Fund, was a hedge fund which invested in
securities traded in the United States
markets such as the New York Stock Exchange.

Between the dates listed above, I promoted
the fund through the telephone and by fax,
simply informing investors that the fund
generated annual profits of 37 percent and
that fund had in excess of 300 million in the
Scotia Bank of the Bahamas.  Those statements
were false and untrue.

In addition, I provided monthly account
statements to various investors which
fraudulently represented active account
balances and monthly returns on the
investments.

On or about February 1, 2005, and March 1,
2005, I wired faxed [sic] potential investors
untrue fraudulent statements here in the
Eastern District of New York.  In fact I used
those monies received from investors to
purchase commercial properties in the
Bahamas, which will be sold to make all
clients whole.[3]

(Aug. 9, 2005 Tr. of Proceedings before the Hon. Joanna Seybert,

U.S.D.J. at 16-17.)

The government reports that its investigation indicates

"that Turner's company never generated a profit from its

investments in equities and that the balance in the fund's bank

_____

[3]  Defendant's company is recorded as "Turner International
Limited" on two occasions in his allocution.  Presumably, it
should be "Turning International Limited."

exceeded $1.5 million.  Instead of investing his clients' funds

in the United States equities markets, Turner purchased

commercial properties for his own benefit.  The fraud ultimately

was determined to have resulted in $55,094,220 in losses to 60

victims."  (Gov't's Aug. 8, 2008 Letter Br. at 3 (internal

citations to PSR deleted).)

Before discussing the positions of the parties, brief

mention will be made of § 1B1.3 independent of the complicating

"foreign conduct" factor.  That will be followed by an overview

of the Second Circuit's seminal decision regarding § 1B1.3 and

foreign conduct, viz. <u>United States v. Azeem</u>, 946 F.2d 13 (2d

Cir. 1991).  Such an overview is necessary to place the parties'

positions in context, and will serve as a prelude to a fuller

discussion of the topic later in this opinion.

<u>DISCUSSION</u>

1.  <u>Relevant Conduct Under § 1B1.3</u>

a) <u>Guideline Text</u>

Section 1B1.3, entitled "Relevant Conduct (Factors that

Determine the Guideline Range)" reads in pertinent part:

a)  <u>Chapters Two (Offense Conduct) and Three
(Adjustments)</u>.  Unless otherwise specified, (i)
the base offense level where the guideline
specifies more than one base offense level, (ii)
specific offense characteristics and (iii) cross
references in Chapter Two, and (iv) adjustments in
Chapter Three, shall be determined on the basis of
the following:

(1) (A)   all acts and omissions committed, aided,

abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense [hereinafter referred to as the "Trailing Clause" of subdivision (1)(A) and (1)(B) of § 1B1.3(a)];

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction; . . . .

(b) <u>Interpretation of § 1B1.3(a)(2) Minus the Trailing Clause</u>.

Defendant stands convicted of three counts of wire fraud under 18 U.S.C. § 1343. Wire fraud is an offense which requires "grouping" under U.S.S.G. § 3D1.2(d). As a result, defendant is accountable for sentencing purposes not only for the conduct embodied within the offenses of conviction but also for his criminal conduct which was "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Although a "common scheme or plan" and

"same course of conduct" are closely related, they are not the same. See id. application note 9. "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." Id. application note 9(A). "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id. application note 9(B).

Here, a juxtapositioning of the government's proffer as to defendant's foreign and domestic activities with a literal reading of § 1B1.3(a)(2) — minus the Trailing Clause — indicates that, if proven, those activities fit comfortably within the ambit of the Guideline's definition of relevant conduct as both part of a common scheme and as part of the same course of conduct.

(c)  Interpretation of § 1B1.3(a)(2) as
     Including the Trailing Clause

If the reference in § 1B1.3(a)(2) to "subdivision (1)(A) and (1)(B)" is read to mean that the conduct subject to grouping must have occurred "during the commission of the offense of conviction, in preparation for that offense, or in the course

-8-

of attempting to avoid detection or responsibility for that offense," the legitimacy of, for instance including some of the earlier foreign victims into the sentencing loss calculations becomes problematic.  U.S.S.G. § 1B1.3(a)(1) (the Trailing Clause).

The time frame for the offenses of conviction pertaining to John Does 1 through 3 are "in or about between February 2001 and April 16, 2005."  (Information ¶ 4.) Therefore, to the extent the Trailing Clause is considered part of § 1B1.3(a)(2), the government will presumably be hard-pressed to convincingly argue that losses sustained by victims prior to February of 2001 are relevant for sentencing purposes.

Although very few of the reported cases in our and other Circuits include reference to the subject § 1B1.3(a)(1) language in their discussions of § 1B1.3(a)(2), some do including the Second Circuit in United States v. Fitzgerald, 232 F.3d 315, 320 (2d Cir. 2000)("Because the tax evasion, fraud, and conversion offenses are properly grouped under § 3D1.2(d), Fitzgerald's fraud and conversion constitute relevant conduct under § 1B1.3(a)(2) so long as the fraud and conversion are found to be an act or omission 'described in subdivision (1)(A) . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"; the portion of "subdivision(1)(A)" cited in Fitzgerald is found in its footnote

7 which reads "[s]ubdivision (1)(A) requires that an act or omission occur 'during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detention or responsibility for that offense'") (internal quotation marks and citations deleted). Contra United States v. Johnson, 347 F.3d 635, 638-40 (7th Cir. 2003); United States v. Vigil, 476 F. Supp. 2d 1231, 1284-85 (D. N.M. 2007)("The paragraph structure of subsection (a)(1)-with its indentations-makes clear that U.S.S.G. § 1B1.3(a)(2) incorporates only subdivisions (1)(A) and (1)(B), not all of subsection (a)(1) [i.e. not the Trailing Clause]; otherwise, relevant conduct beyond the crime of conviction would fall outside the scope of U.S.S.G. § 1B1.3(a)(2) and the entire subsection would be rendered meaningless.").

Given that this issue has not been previously mentioned by the Court or either party, and that I have accepted, subject to a number of preconditions discussed infra, that one of the government's theories is adequate to include some or all of the foreign victims in the sentencing calculations, input from counsel is required on this issue, viz. whether the last three lines of § 1B1.3(a)(1) should be read into § 1B1.3(a)(2).[4]

---

[4] In the CONCLUSION of this opinion, the Court will list the previously unaddressed significant items bearing on the foreign conduct issue, and provide the procedure for counsel to submit their views.

In any event, to the extent some or all of Turner's foreign conduct falls within § 1B1.3(a)(2) as part of the same scheme or course of conduct as the counts of conviction, that does not necessarily mean, as discussed _infra_, that his defrauding of foreign investors may be factored into his total offense level as relevant conduct.

2.    United States v. Azeem, 946 F.2d 13 (2d Cir. 1991)

The defendant in _Azeem_ was convicted of conspiracy to import heroin into the United States.  The realized goal of the conspiracy was to transport heroin from Pakistan to New York.  At about the same time, Azeem, and one of his conspirators vis-a-vis the Pakistan to New York transaction, arranged for the delivery of additional heroin from Pakistan to Cairo.  The question arose whether that second transaction should be included as relevant conduct in determining Azeem's guideline range.  Azeem argued to the Circuit that it should not be, "because 1) it was not part of the same crime and 2) it was not a crime against the United States."  _Azeem_, 946 F.2d at 15.

The Circuit gave short shrift to the first argument, finding that the Cairo transaction was properly included in the guideline calculations because it was part of the same "course of conduct" as the count of conviction.  _Id._ at 16 (citing § 1B1.3(a)(2)).  Azeem fared better on his second argument, with the Circuit agreeing "that the Cairo transaction should not have

been included in the base offense level calculation because it was not a crime against the United States." Id. In reaching that conclusion, the Circuit explained:

> The Guidelines section on base offense levels is broadly worded to include "all such acts and omissions that were part of the same course of conduct or common scheme or plan," but does not explicitly address the issue of foreign crimes and activities. However, the Guidelines elsewhere note that foreign sentences may not be used in computing a defendant's criminal history category, but may be used for upward departures from the otherwise applicable range.[5]
>
> From these provisions, it follows that Congress, while it has not remained entirely silent, has chosen to assign to foreign crimes a rather limited role. We decline to find that Congress intended to require that foreign crimes be considered when calculating base offense levels simply because Congress did assign foreign crimes a role in fixing upward departures, while remaining silent on their role in calculating base offense levels. Not every congressional silence is pregnant. In general, congressional consideration of an issue in one context, but not another, in the same or similar statutes implies that Congress intends to include that issue only where it has so indicated. In this case, Congress has already shown that where it intends to include foreign crimes in sentencing [as it did for upward departures,] it will do so.

Id. at 17 (internal citations and parentheticals deleted).

_____

[5] The cites provided regarding the "upward departures" referenced in the above quote from Azeem are §§ 4A1.2(h) and 3A1.3(a), both of which pertain to considering foreign sentences in evaluating the sufficiency of a defendant's criminal history category.

-12-

Although the holding in <u>Azeem</u> is primarily, if not solely rooted in the Circuit's interpretation of the intent underlying the promulgation of § 1B1.3(a)(2), the Court, nevertheless, underscored that "there are good reasons" for excluding foreign crimes from base offense level calculations. <u>Id.</u>

> To do [otherwise] would require distinguishing between activities that violate both domestic and foreign law and those which violate only domestic law or only foreign law.  Examples of activities that violate one, but not both, foreign and domestic laws could be the use and sale of certain drugs that would have violated our law, but not the foreign law where sold and used, or a certain use of alcohol that violates the foreign law where used but would not have done so under domestic law.  To permit foreign crimes to figure in fixing the base offense level would require courts to perform a careful comparative analysis of foreign and domestic law in such instances. At some point the advantages of simplicity should prevail.  This is one of them.

<u>Id.</u>

3.  Probation Department's Guideline Calculations, Initially and Now

The government maintains that the Probation Department's February 1, 2006 amended PSR correctly recommends a total offense level of 39, resulting in a sentencing range of 262 to 327 months.[6]  The corresponding figures in the initial PSR

---

[6]  As noted earlier, the statutory maximum for each of the counts of conviction is 20 years.

dated September 25, 2005 were a level 30 and a guideline range of 97 to 121 months.[7]  The 9 level differential in the base offense level between the original and the amended PSRs is attributable to (1) an escalation in the loss amount from $15,686,462 (sustained by 57 victims) to $63,836,408 (sustained by 63 victims),[8] (2) the elimination of the previously given 3 level reduction for acceptance of responsibility, and (3) an added two level obstruction of justice enhancement.[9]

The increased loss amount is primarily the result of adding the losses said to have been sustained by Australian John Knight in Australia to the tune "of $51,199,697 Australian dollars (the U.S. equivalent of $37,770,016)".  (Second Addendum to PSR (Revised) dated Sept. 16, 2008 at 1.)[10]

---

[7]  The parties' Plea Agreement estimated the total offense to be a 29 and the guideline range to be 87 to 108 months.

[8]  The loss amount reported in the September 16, 2008 Second Addendum to the PSR is $55,094,220, rather than the $63,836,408 amount indicated in the February 1, 2006 PSR.  The $8,000,000 plus difference, however, does not effect the guideline calculations.  See U.S.S.G. § 2B1.1(b)(1)(M).

[9]  Defendant posits that the differential is not 9 levels but rather 11.  (Def.'s Sept. 5, 2008 Letter Br. at 11.)

[10]  The current PSR recommendation is based on the common modus operandi utilized by defendant in defrauding "investors in Australia . . . [,] the United States, the Bahamas, England, Singapore, and other countries world wide," viewed in conjunction with the representation by the government "that funds invested by Dr. Knight, as well as other overseas victims, were either deposited or cleared through U.S. bank accounts."  (Second Addendum to PSR (Revised) dated Sept. 16, 2008 at 5.)  Mention of Azeem is absent from the PSR analysis.  Moreover, the record is

4.  <u>Government's Position</u>

     <u>Azeem</u>, as the government correctly notes, bifurcates the § 1B1.3 analysis into two parts: (1) whether the subject conduct is part of the same course of conduct or common scheme as the offense of conviction and (2) whether the conduct is a crime against the United States.  As to the same course of conduct or common scheme portion of the analysis, it was the government's understanding that the defendant had conceded that issue when the case was before Judge Seybert and, accordingly, the primary focus of its current arguments concerns <u>Azeem's</u> second requirement, i.e. whether the conduct involved constituted a crime against the United States.

     The gravamen of the government's position in its numerous written submissions is that Turner's conduct, both domestic and foreign, entails one continuous, inextricably intertwined, i.e. non-severable scheme and, thus, is not subject to the <u>Azeem</u> rationale and requires that all of the associated conduct be considered for purposes of § 1B1.3.  That is so, the government posits, even though some of the subject acts "would not be crimes against the United States [referencing Defendant's foreign conduct] if they were unconnected to an American scheme." (Gov't's Aug. 8, 2008 Letter Br. at 10.)  This argument will be

_____

devoid of evidence that Dr. Knight's funds, or those of any other foreign victims, were "deposited [in] U.S. bank accounts."  (<u>Id.</u>)

referred to as the government's "inextricably intertwined theory."

During oral argument on November 19, 2008, however, the government seemed to take a different tack, arguing that Turner's transfer of money from Australia to the Bahamas through a United States correspondent bank "would give the United States jurisdiction to charge that fraud [under 18 U.S.C. § 1343]," even "absent any evidence [of] commingling" (hereinafter "transfer jurisdictional theory"). (Nov. 19, 2008 Tr. at 12; see also id. at 14.) The Court was then advised that "[i]t will be the government's position that if the United States has jurisdiction over the offense it would be a crime on the United States [for purposes of satisfying the second prong of the Azeem standard]." (Id. at 14.) And if the transfer was sufficient by itself to confer jurisdiction, the transfer plus, inter alia, the later commingling and use by Turner of domestic and foreign victims' funds in perpetrating the subject Ponzi scheme, is, the government maintains, certainly more than sufficient for that purpose (hereinafter "transfer plus jurisdictional theory").

The positions urged at oral argument as to the government's "transfer jurisdictional" and "transfer plus jurisdictional" theories are succinct and essentially consist of

what has already been stated.[11]  The same may not be said of its "inextricably intertwined theory," which is multi-faceted and includes the following:

   a.   The monies on deposit in the Commonwealth Bank of Australia were routed "through correspondent banks in the United States" when Turner relocated his operation from Australia to the Bahamas.  (Nov. 14, 2008 Tr. at 12-13);

   b.   Some foreign victims sent additional sums to Turner's operation in the Bahamas via "Telegraphic Transfer[s]" through United States correspondent banks.  (See, e.g., Ex. B attached to the Sept. 23, 2005 Petition of Ian Gordon Turner referenced in the Gov't's Aug. 8, 2008 Letter Br. at 11);

   c.   Upon Turner's expansion of his operation to include United States investors, their monies were commingled in the Scotiabank account in the Bahamas with funds obtained from foreign investors.  (Nov. 19, 2008 Tr. at 6);

   d.   From that Scotiabank account, the government proffers, "commissions [were paid] to salespeople in the United States perpetrating the United States fraud."  (Id. at 7);

   e.   In Turner's "trading room in the Bahamas," there were "plasma screens . . . leased from Bloomberg in the United States," with "live feed," all paid for with the

_____

   [11]  The "transfer jurisdictional theory" and "transfer plus jurisdictional theory" shall be referred to collectively as the government's "jurisdictional theories."

commingled investor funds in the Scotiabank account. (<u>Id.</u>);

   f. Turner established a trading account in November 2000 at R.J. O'Brien in Chicago funded with $1,250,000 taken from two additional accounts of Turning International in the Bahamas, to wit, one at "Barclays and [the other at] Citibank." (<u>Id.</u> at 8. <u>See also</u> Gov't's Nov. 12, 2008 Letter Br. at 3);

   g. Turner had an investment brochure "manufactured . . . in the Eastern District of New York" which "brochure was paid for out of the Scotia Bank account." (Nov. 19, 2008 Tr. at 8); and

   h. Given that this was a "Ponzi scheme," coupled with the fact that investors' monies were supposedly commingled in the Scotiabank account, the government proffers that foreign monies were used to make some payments to the United States investors and vice versa. (<u>Id.</u> at 9.)

   During oral argument on November 19, 2008, the government indicated that although the services of a United States correspondent bank were required to be, and were used to transfer foreign victims' monies to the Bahamas,[12] it had no

---

   [12] As explained by the government during oral argument on November 14, 2008, in discussing "the importance of . . . corespondent banks, it would basically be impossible for . . . the CBA account in Australia . . . to transfer [funds] directly to the Bahamas absent United States intervention. There would be no way for Australia to directly wire that. The U.S. bank, the correspondent bank, is a necessary piece of the puzzle for him to

proof that a "US bank account . . . was used . . . to implement
the fraud of foreign investors." (Nov. 19, 2008 Tr. at 5-6; see
also Nov. 14, 2008 Tr. at 20-21.)  And to the court's inquiry
whether the R.J. O'Brien account was involved in the purported
fraud, the government indicated, as earlier noted, that monies
were taken from the Barclays and Citibank facilities in the
Bahamas to fund that account, and that of the $1,250,000 involved
all but $75,000 was lost, with that remainder being remitted to
the Scotiabank.  Whether any of the monies invested by Knight
were ever included in the R.J. O'Brien account because of
commingling of investor funds is not entirely clear based on the
materials furnished.  What is clear, however, is that the R.J.
O'Brien account was not used to defraud investors or to otherwise
advance the scheme.

5.  <u>Defendant's Position</u>

        The defendant's arguments, in positing a loss figure of
"$3.98 million U.S. Dollars" for purposes of calculating
defendant's guideline range (Def.'s July 7, 2008 Letter Br. at
3), are as follows:

        a.  "Derek Turner has not been charged with any
crimes by the authorities in the Bahamas, Australia, or New
Zealand.  Thus, Mr. Turner's situation is <u>exactly</u> the type of

_____

get his money from point A to point B."  (Nov. 14, 2008 Tr. at
34.)

case envisioned by the Second Circuit in its analysis in Azeem. The United States Courts would be compelled to analyze the alleged crimes committed in these various foreign jurisdictions and determine whether they were constitutionally proper by United States standards, and, after potentially passing such scrutiny, what punishment would be appropriate for said alleged crimes. In any event, all parties herein are completely ignorant as to what, if any crimes Mr. Turner may have committed in those foreign jurisdictions outlined above. Mr. Turner must be punished for that which can be considered a crime against the United States. In this case, that would be only the $3.98 million U.S. Dollars that came to Turning International in the Bahamas by way of United States bank accounts, controlled by United States citizens or legal residents." (Def.'s Sept. 5, 2008 Letter Br. at 3, n.1);[13]

   b.   "Mr. Conway, over the vehement objections of Mr. Turner, agreed to a loss amount of $16,706,765.00 for the purposes of a Guideline Range." (Def.'s Nov. 12, 2008 Letter Br. at 3);[14]

   c.   "The government contends that Azeem is

---

[13]   For a more detailed explanation of defendant's claimed loss figure, see Def.'s Oct. 30, 2008 Letter Br. at 4.

[14]   Defense counsel sent two letters to the Court dated November 12, 2008 which were filed in the Clerk's Office on November 13, 2008, one with an attachment, one without. The above cite is to the November 12th letter with an attachment.

distinguishable from Turner's case because the acts underlying Turner's overall scheme were more inextricably intertwined. However, the government's position both misconstrues the facts in Azeem and continues its error in looking at the offense of wire fraud as the actor's underlying intent [i.e. the mens rea element of wire fraud] as opposed to his act [i.e. the use of the wires] manifesting or accomplishing that intent. Each wire communication is no less a separate crime than each act of distributing drugs as part of a broader distribution scheme [as was present in Azeem]." (Def.'s Sept. 5, 2008 Letter Br. at 9);

     d.   "Whereas Turner solicited his U.S. investors by means of a written prospectus that contained numerous false representations about the size of Turner's portfolio, his current trading activity, and his extraordinary annual gains, Knight merely alleged that Turner, in conversation, unduly minimized the risks and unduly touted the benefits of his investments strategies . . . . The only clearly fraudulent conduct involving Knight occurred several years later when Mr. Turner, now operating in the Bahamas, sent Dr. Knight account statements falsely reporting investment income. Such misconduct did not retroactively convert Mr. Turner's acceptance of Dr. Knight's original investments into fraud. In sum, the individual criminal acts in Azeem were far more 'intertwined' than the acts over six years compromising Mr. Turner's alleged scheme." (Id. at 10);

e. "[I]t would be error to incorporate the losses suffered by Dr. Knight and as many as 14 other overseas investors with no nexus to the United States, and in classifying them as 'victims.' This would unfairly cause Mr. Turner's Guidelines level to be increased by eleven levels . . . ." (<u>Id.</u> at l1);

f. Defendant contends that, contrary to the position urged by the government, "Mr. Turner <u>did not commingle</u> Dr. Knight's funds from Australia with monies of citizens of the United States." (Def.'s Oct. 30, 2008 Letter Br. at 3);

g. Defendant points out that to the extent monies were transferred from an Australian bank to one or more banks in the Bahamas through correspondent banks in New York, such movement represents a de minimis contact with this jurisdiction since it was done via "an electronic pulse or instantaneous switching process, resulting in such funds being electronically directed to the Bahamas. The correspond[ent] bank in New York is not a bank where Turning International, Ltd. had any account at any time. Turning International never had any bank accounts in the United States of America." (<u>Id.</u> at 4); and

h. "The Government cannot prove, definitively, what, if any, of Dr. Knight's funds were sent to the R.J. O'Brien account of Mr. Turner. The Government, in order to justify a life sentence for Mr. Turner has to do better than simply to

write that 'Dr. Knight's funds <u>appear</u> to have been sent to the R.J. O'Brien account.'" (Def.'s Nov. 12, 2008 Letter Br. at 4[15] (quoting Gov't's Nov. 12, 2008 Letter Br. at 3).)

Before proceeding to the DISCUSSION portion of this opinion, it warrants mention that defense counsel, not only in his written submissions but during oral argument as well, has consistently challenged the government's position that Turner's transfer of monies from Australia to the Bahamas via a New York correspondent bank would have provided a predicate to include his overseas conduct in a domestic prosecution, thus supposedly satisfying Azeem's "crime against the United States" standard. In defense counsel's view, that de minimis contact is insufficient to override the holding and rationale in <u>Azeem</u>.

6.    Section 1B1.3(a)(2) Rule in the Second Circuit
      Regarding Foreign Conduct as Explained in
      <u>United States v. Azeem and United States v. Chunza-Plazas</u>

As noted, <u>Azeem</u> is the seminal Second Circuit case in which it was held that a defendant's foreign conduct should not be considered in the calculation of his base offense level given that such conduct was not a crime against the United States. Another, as yet unmentioned Second Circuit decision which is instructive for present purposes is <u>United States v. Chunza-Plazas</u>, 45 F.3d 51 (2d Cir. 1995).

---

[15]    This cite is to defense counsel's other November 12, 2008 letter, i.e. the one without an attachment.

Chunza was convicted of possessing false immigration documents. The government sought, inter alia, "an upward departure [of 16 levels in computing his offense level, pursuant to §§ 5K2.0 and 5K2.9], claiming that Chunza's motivation in obtaining and using the false green cards [was] . . . . to assist Escobar in collecting money owed to the [Medellin c]artel and to avoid further prosecution in Columbia related to his activities in the [c]artel." Id. at 52, 54 (internal citations and quotation marks omitted).

The district court granted the government's application, explaining

> it seems to me that certainly by a
> preponderance of the evidence Mr. Chunza was
> a member of the Medellin Cartel. He
> committed criminal acts at the behest of Mr.
> Pablo Escobar and came to the United States
> both to assist Escobar in collecting money —
> and I think it's a fair inference that he
> also came to the United States to avoid
> further prosecution. . . .

Id. at 55.

That determination was vacated by the Circuit:

> The same considerations considered in Azeem
> with respect to [the] base offense level,
> should guide our determination of whether
> Chunza's conduct in Colombia may be
> considered for an upward departure. Like
> Azeem's Egyptian conspiracy, Chunza's illegal
> activities in Columbia were not crimes
> against the United States, and therefore
> should not be included in the guideline
> calculation.

Id. at 57.

In sum, Chunza-Plazas, like Azeem, instructs that foreign conduct not constituting crimes against the United States should not be considered for purposes of calculating the guideline range for the counts of conviction.

7.  Several Other Guideline Cases Which Mention Azeem and Chunza-Plazas Warrant Discussion

(a) Southern District of New York Decision in United States v. Teyer

To the extent that Azeem and Chunza-Plazas may be proffered as support "for the proposition 'that criminal conduct committed by a foreigner in a foreign country can not be considered as relevant conduct or be used as the basis of an upward departure'" (quoting from defendant's Br.), Judge Lynch of the Southern District has opined that "[n]either case can be so broadly construed." United States v. Teyer, 322 F. Supp. 2d 359, 367 n.3 (S.D.N.Y. 2004).

Teyer did not involve § 1B1.3 but rather the issue of whether an obstruction of justice enhancement should be made under § 3C1.1 in calculating defendant's guideline range. Torres-Teyer was arrested and charged in Belize with possession of 1500 kilograms of cocaine which were destined for the United States.  He arranged to bribe his co-defendants to take full responsibility for the drugs, as well as a Belizean magistrate to ensure his acquittal in that jurisdiction.  Judge Lynch applied the subject enhancement, reasoning that the Belizean prosecution

-25-

and the investigation of Torres-Teyer by the DEA and other United States authorities were so "closely intertwined," that Torres-Teyer's "effort to frustrate the Belizean prosecution would reasonably be expected to have an effect on the prosecution here." Id. at 367. And, given that § 3C1.1 explicitly requires that a defendant's conduct be "willful," also implicitly embraced in the Teyer holding is the requirement that such an obstructive effect must have been intended by Torres-Teyer.

Teyer holds (1) that if a defendant engages in foreign conduct which is closely intertwined with the count or counts of conviction, and was intended to impede a United States investigation and/or prosecution, he or she is appropriately saddled with a 2 level § 3C1.1 enhancement, and (2) nothing in Azeem or Chunza-Plazas dictates a contrary result.

Before discussing some decisions mentioning Azeem from other Circuits, one of the Second Circuit cases mentioned in Teyer, United States v. Greer, 285 F.3d 158 (2d Cir. 2002) will be discussed.

(b) Second Circuit in United States v. Greer

The relevant portion of Greer involves the government's cross-appeal directed at the district court's exclusion for sentencing purposes of a quantity of drugs that were attributable to the defendant but were not intended for distribution in the United States and had already been the subject of a Canadian

prosecution.  Greer was convicted in the United States of, inter alia, conspiring to import hashish and marijuana in violation of the Maritime Drug Law Enforcement Act ("MDLEA").[16]  The proof established that from 1989 to 1991, Greer and his co-defendants offloaded tons of contraband from vessels in the St. Lawrence River into the United States and into Canada for distribution in those countries.  At sentencing, the district court held that only the portion of product earmarked for distribution here, i.e. 2% of the total, constituted relevant conduct under § 1B1.3(a)(1)(A), concluding that the other 98% constituted "'foreign drugs.'"  285 F.3d at 179.  The Circuit reversed, pointing out that <u>Azeem</u> was not inconsistent with its determination since in <u>Azeem</u> the crimes were not committed against the United States, whereas the crimes committed by Greer were "not foreign crimes; the MDLEA is a United States criminal statute that specifically covers conduct outside the United

---

[16]  At the time of the <u>Greer</u> decision, "[t]he MDLEA ma[d]e[] it unlawful for "any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States . . . to knowingly or intentionally . . . distribute . . . a controlled substance."  <u>Greer</u>, 285 F.3d at 174 (quoting 46 U.S.C. app. § 1903(a), presently codified at 46 U.S.C. § 70503(a)).  The Act provided that "a 'vessel subject to the jurisdiction of the United States' includes . . . a vessel located in the territorial waters of another nation, where the nation consents to the enforcement of United States law by the United States."  <u>Id.</u> (quoting 46 U.S.C. app. § 1903(c)(1)(E), presently codified at 46 U.S.C. § 70502(c)(1)(E)).  "Consent . . . may be proved by the certification of the Secretary of State or the Secretary's designee."  <u>Id.</u> (quoting 46 U.S.C. app. § 1903(c)(1)(E), presently codified at 46 U.S.C. § 70502(c)(2)(B)).

States." Id. at 179-80.

(c) Seventh Circuit Court of Appeals' Decisions Citing, but Distinguishing Azeem and Chunza-Plazas

Another case cited in Teyer is United States v. Dawn, 129 F.3d 878 (7th Cir. 1997), a Seventh Circuit decision distinguishing both Azeem and Chunza-Plazas upon which Dawn apparently placed considerable stock.

Dawn pled guilty to receiving and possessing films depicting minors engaged in sexually explicit conduct. He admitted that he produced the films in Honduras while employed there as a schoolteacher. At sentencing, the district court cross-referenced the guideline for the production of child pornography, thus substantially increasing the guideline range.

Dawn's reliance on Azeem and Chunza-Plazas in arguing that the enhancement was improperly imposed was unavailing, with the Seventh Circuit panel explaining:

> In Azeem, the conduct in question (distribution of heroin abroad) took place wholly on foreign soil and had no link to the offense of conviction (conspiring to import heroin into the United States) other than being part of the same course of narcotics trafficking. In Chunza-Plazas, the link was more tenuous; the defendant had committed murder abroad and subsequently fled to the United States, where he was eventually convicted of possessing false immigration documents. In this case, however, Dawn's exploitation of minors in Honduras created the very pornography that he received and possessed here in the United States. In a literal sense, then, Dawn's domestic offenses were the direct result of his relevant

-28-

conduct abroad; pragmatically speaking, they
are inextricable from one another.

Id. at 885 (citations deleted).

The Dawn reference to the foreign production of the
child pornography being "inextricabl[y]" linked to the possession
count of conviction is at least arguably akin to that portion of
the Teyer holding which speaks of the foreign conduct being
"closely intertwined" with the United States crimes committed by
Torres-Teyer.

Another opinion of the Seventh Circuit discussing Azeem
and Chunza-Plazas is United States v. Farouil, 124 F.3d 838 (7th
Cir. 1997). Farouil was found guilty by a jury of knowingly
importing heroin into the United States. At sentencing, he was
held accountable, under § 1B1.3(a)(2), for drugs recovered from
his traveling companion upon her arrest in Belgium which drugs
were intended for transport to the United States as part of the
same scheme of which defendant stood convicted.

That determination was affirmed, with the Circuit
finding that Farouil's reliance on Azeem and Chunza-Plazas was
misplaced because his traveling partner's "crime was . . .
directed against the United States, unlike Azeem and Chunza-
Plazas where the foreign crimes did not affect the United States
and were not intended to affect the United States." Id. at 845.

8.    Application of Azeem, Chunza-Plazas, Greer, Teyer,
      Dawn, and Farouil to Government's Request That
      Turner's Foreign Conduct be Considered in Determining

-29-

his Guideline Range Under its Inextricably Intertwined Theory.[17]

To partially reiterate, under <u>Azeem</u> foreign conduct may not be considered in calculating a defendant's guideline range unless such conduct (a) is part of the same scheme or course of conduct as the count or counts of conviction under § 1B1.3(a)(2), and (b) constitutes a crime against the United States. <u>Chunza-Plazas</u> indicates that the same rationale precludes an upward adjustment of the guideline offense level based on a defendant's foreign conduct.

However, the <u>Azeem</u> rationale is not applicable to cases such as <u>Greer</u> where the purported foreign conduct is not foreign at all, being specifically covered, and thus violative of a United States criminal statute.

Finally, such cases as <u>Teyer</u>, <u>Dawn</u> and <u>Farouil</u>, though not binding on this Court, indicate that foreign relevant conduct closely intertwined and directed at this Country (as in <u>Teyer</u> and in <u>Farouil</u>), or "inextricabl[y]" tied to the count of conviction (as in <u>Dawn</u>) should be factored into the sentencing guideline calculations and that such inclusion does not run afoul of <u>Azeem</u> and <u>Chunza-Plazas</u>.

---

[17] The government has not cited nor relied upon the impact rationale embodied in such cases as <u>Teyer</u> and <u>Farouil</u>. Nonetheless, a discussion of those cases has been included given that those decisions are among the few that discuss <u>Azeem</u>, and <u>Teyer</u> discusses the link between Torres-Teyer's foreign conduct and his domestic prosecution.

It is undisputed that Turner, a New Zealand citizen, while operating first in Australia and later from the Bahamas, engaged in the foreign conduct, viz. the purported defrauding of non-Americans, which the government contends constitutes relevant conduct and, as such, should be factored into Turner's sentence for defrauding John Does 1 through 3.

The thrust of the government's argument under its inextricably intertwined theory is not that Turner's foreign conduct violated a specific United States statute as in <u>Greer</u>, or was intended to produce an effect or impact in the United States as in <u>Farouil</u> and <u>Teyer</u>. Nor does the government maintain that Turner's conduct in defrauding residents of Australia, New Zealand and other non-Americans, viewed independently of his victimization of John Does 1, 2 and 3, satisfies <u>Azeem's</u> "crime against the United States" standard. (<u>See</u> Gov't's Aug. 8, 2008 Letter Br. at 10.) Instead, it argues that all aspects of Turner's scheme, as evidenced by the earlier identified facts, are "inextricably intertwined" to the extent that both the foreign and domestic conduct must be considered together in determining Turner's guideline range. (<u>Id.</u> at 13.)

The linchpin of the government's argument, i.e. the phrase "inextricably intertwined," is akin to the language "inextricable from one another" found in <u>Dawn</u>. As the reader will recall, Dawn was the schoolteacher from the United States

who produced child pornography in Honduras and, upon returning to America, brought his work product with him, leading to his arrest and conviction for possession of child pornography; his guideline calculations were enhanced via a cross-reference to § 2G2.1, the guideline pertaining to the production of such material. The Seventh Circuit, while expressing misgivings about the analytical foundation for the Azeem holding, Dawn, 129 F.3d at 885 n.11, explained that "[i]n Azeem, the conduct in question (distribution of heroin abroad) took place wholly on foreign soil and had no link to the offense of conviction (conspiring to import heroin into the United States)," whereas "Dawn's domestic offenses were the direct result of his relevant conduct abroad" and thus the holdings in the two cases are not at odds. Id. at 885.

Dawn, of course, is not binding on this Court. Whether the Second Circuit would have reached the same conclusion as their fellow circuit judges in the Seventh Circuit on the same facts is problematic for it is difficult to reconcile its holding with Azeem's. Moreover, Turner's domestic conduct, while clearly part of the same scheme and course of conduct, cannot legitimately be labeled, in the language of Dawn, "as the direct result of his . . . conduct abroad." Accordingly Dawn provides scant, if any, aid to the prosecution.

Of the cases brought to the Court's attention by the parties, as supplemented by in-chambers research, the district

court decision in <u>Teyer</u> alone seems to lend some, albeit insufficient support for the government's position under its inextricably intertwined theory.  On the plus side from the government's perspective, at least at first blush, is <u>Teyer's</u> reliance in making the obstruction of justice enhancement on the "close[] intertwin[ing]" between the foreign conduct in Belize and domestic count of conviction.  <u>Teyer</u>, 322 F. Supp. 2d at 367. But central to that interrelationship was the underlying pre-indictment joint binational investigation of the defendant, a circumstance not present here.  Moreover, the joint investigation of Torres-Teyer must be viewed in conjunction with the other, and more significant factor embodied in the <u>Teyer</u> interrelationship analysis, that being that defendant's conduct in Belize could "reasonably be expected" to have a negative impact on the prosecution in this country.  <u>Id.</u>  That other factor, viz. the foreign conduct targeting the United States, is also absent as to Turner's Australia and Bahamas-based victimization of foreign investors.  Which is to say, <u>Teyer</u>, does not support the government's inextricably intertwined theory.

        The government urges that its factual proffers — previously listed, and assumed for purposes of the argument currently under discussion to be true  — compel the conclusion that "[u]nlike in <u>Azeem</u>, . . . it is impossible to separate Turner's conduct into a 'foreign component' and a

'United States component.'" (Gov't's Aug. 8, 2008 Letter Br. at
13.) This argument, made absent any supporting authority, is
unconvincing. Just as the Circuit parsed the domestic and
foreign components of the shared course of conduct in <u>Azeem</u>, the
same may, and should be done here. There is no reason to believe
that the losses sustained by the American investors for guideline
purposes may not be calculated independently from those said to
have been sustained by foreign investors as a result of Turner's
foreign crimes.

In both <u>Azeem</u> and here it is clear that the defendant's
ongoing domestic and foreign criminal activities were part of the
same "course of conduct" for purposes of § 1B1.3(a)(2).
Accordingly, it is not surprising that there were significant
overlaps between the different parts of their respective
operations. Nonetheless, the interrelationship here, as
previously noted, falls far short of that present in <u>Dawn</u>, and
there is no evidence to suggest, unlike in <u>Teyer</u>, that the
subject foreign conduct (i.e. the defrauding of Knight and other
foreign investors) targeted, or was intended to produce
some type of impact in the United States. <u>Cf.</u> <u>United States v.</u>
<u>Goldberg</u>, 830 F.2d 459, 462 (3d Cir. 1987)("[W]e find precedent
for extending the jurisdiction of the federal courts to include
offenses [such as those with which Goldberg was charged,
including wire fraud], wholly committed outside of this country,

if the acts are intended to have an effect in the United

States.").

In sum, the government's application to include

Turner's foreign conduct in the guideline calculations under its

inextricably intertwined theory is unconvincing, whether viewed

alone or in conjunction with the impact rationale articulated in

Teyer.

9.   Government's Jurisdictional Theories

Attention will now be directed to the rationale

underlying the government's jurisdictional theories, i.e. that

the Azeem phrase, "crime against the United States," should be

interpreted literally so that if Turner's defrauding of Knight,

and multiple other foreign investors from various countries

throughout the world, could have been prosecuted in the United

States, the conduct under discussion is, by definition, a "crime

against the United States" not only for jurisdictional, but also

for sentencing purposes.

During oral argument on November 19, 2008, I asked the

prosecutor "does the government contend that the defrauding of .

. . non-U.S. individuals, including Dr. Knight, constituted a

crime against the United States [referring to the second Azeem

factor]?"  (Nov. 19, 2008 Tr. at 13.)  To that inquiry, she

replied:

> "My answer to that is yes, and it is because
> of my interpretation of what the circuit

> means [again, referencing, the <u>Azeem</u> phrase
> "crime against the United States"]. . . .  It
> will be the government's position if the
> United States has jurisdiction over the
> offense, it would be a crime on the United
> States.

(<u>Id.</u> at 13-14.)

This alternate government theory, i.e. its jurisdictional argument, has, as noted earlier, been bifurcated in its presentation.  The first part consists of the claim that Turner's use of a New York correspondent bank "to move . . . money from Australia to the Bahamas," standing alone, would be sufficient to prosecute him under § 1343 for defrauding his foreign victims, with the second part being that the use of the correspondent bank, supplemented by, inter alia, the commingling of the foreign and domestic monies realized from the Ponzi scheme to perpetuate the scheme, more than satisfies the "crime against United States" <u>Azeem</u> requirement.  (<u>Id.</u> at 12.)  The two parts of this bifurcated argument will be addressed seriatim.  Before doing so, however, the following preliminary matters will be discussed: (a) the meaning of the term "crime against the United States," (b) relevant parts of the law of wire fraud generally, and (c) the cases cited by the government in support of its jurisdictional theories.

> (a)  The Term "Crime Against the United States"
>      Should be Interpreted to Mean That That if
>      Foreign Conduct Could Have Been Prosecuted
>      Here Such Conduct Satisfies the Second Part
>      <u>of the Azeem § 1B1.3(a)(2) Standard</u>

In _Azeem_ and _Chunza-Plazas_, as well as in _Teyer_, _Dawn_ and _Farouil_, the overseas conduct was so clearly foreign in character that no elaboration of the term "crime against the United States" was required or given. As a result, its meaning may be debatable. But given the apparent absence of any precedent, it seems to me the term should be interpreted literally, i.e. precisely as it is written. _Cf._ _Greer_, 285 F.3d at 179-80. Granted, the Circuit explained in _Azeem_ that the Congress in approving the Guidelines assigned a limited role to foreign crimes, which role did not embrace their inclusion in guideline calculations under § 1B1.3. However, if foreign conduct constitutes "a crime against the United States," those activities lose their solely overseas significance and should be considered as relevant conduct if part of the same course of conduct or common scheme as the counts of conviction. _Cf._ _Greer_, 285 F.3d at 179-80 ("[T]he crimes in this case [, unlike the Pakistan to Cairo transaction in _Azeem_] are not foreign crimes; the MDLEA is a United States criminal statute that specifically covers conduct outside the United States.").

> (b) Relevant Parts of the Law of Wire Fraud
>      Generally

Section 1343, entitled "Fraud by Wire, Radio, or Television" reads in pertinent part as follows:

> Whoever, having devised or intending to
> devise any scheme or artifice to defraud, or
> for obtaining money or property by means of

> false or fraudulent pretenses,
> representations, or promises, transmits or
> causes to be transmitted by means of wire .
> . . . in interstate or foreign commerce, any
> writings, signs, signals, pictures, or
> sounds for the purpose of executing such
> scheme or artifice, shall be fined under
> this title or imprisoned not more than 20
> years, or both. . . .

18 U.S.C. § 1343.

The essential elements of wire fraud are "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the . . . wires[] to further the scheme." Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004). The defendant need not personally use the wires because the term in § 1343 "transmits or causes to be transmitted" has been interpreted to mean that "one causes a wire transmission when he act[s] with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen." United States v. Kim, 246 F.3d 186, 190 (2d Cir. 2001)(internal citation and quotation marks omitted). "To prove that interstate wire facilities were used in furtherance of a fraudulent scheme the government [is not required to show] that the wire transmission was an essential element [of the scheme], but simply that it was for the purpose of executing the scheme." United States v. Ford, 603 F.2d 1043, 1047 (2d Cir. 1979)(internal citation omitted). A use of the wires after the underlying scheme to defraud has been

accomplished falls outside the ambit of § 1343.  See United States v. Maze, 414 U.S. 395 (1974).[18]

However, the goal of the scheme has not necessarily been realized for purposes of § 1343 because the wrongdoer has the illicit proceeds in hand.  See Schmuck v. United States, 489 U.S. 705 (1989)(Schmuck, a used car wholesaler was convicted of mail fraud based on "an ongoing fraudulent venture" of selling cars to retailers with rolled-back odometers, id. at 711; the mailings found to be adequate by the Supreme Court for purposes of § 1341 consisted of re-registration forms sent by the ultimate purchasers of the vehicles to the motor vehicle department with the Court explaining "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme," id. at 712).

> (c)  Cases Cited by Government in Support
>      of its Jurisdictional Theories

The three cases cited by the government during oral argument on November 19, 2008 in support of its jurisdictional positions are Kim, 246 F.3d 186, United States v. Trapilo, 130

_____

[18]  The statute in Maze was 18 U.S.C. § 1341, the mail fraud statute, not § 1343.  However, the elements of mail fraud and wire fraud are essentially the same and are analyzed in the same way.  United States v. Trapilo, 130 F.3d 547, 552 n.7 (2d Cir. 1997).

F.3d 547 (2d Cir. 1997), and <u>United States v. Gilboe</u>, 684 F.2d 235 (2d Cir. 1982).

Kim was an employee of the United Nations in New York. While on an overseas assignment in Croatia, he concocted a scheme to submit inflated travel invoices to his employer's New York office.  The implementation of that scheme required transmitting the bogus invoices to New York and the receipt thereafter of funds from New York.  On appeal, Kim argued that the district court lacked jurisdiction over his case "because none of his conduct, or that of his co-conspirators, occurred in the United States and the wire fraud statute under which he was prosecuted was not intended to apply to an entirely foreign fraud."  <u>Kim</u>, 246 F.3d at 188.  That argument was rejected, with the Circuit initially noting that the Congress amended § 1343 in 1956 specifically for the purpose of including the term "foreign commerce," thereby making it clear that the statutory prohibition extended to communications between countries such as those triggered by Kim's actions.  Given that <u>Kim</u> involved a United States citizen defrauding his United States based employer partially through the use of domestic telecommunication systems, the Circuit concluded that his wire fraud conviction rested on sound jurisdictional footing.

Trapilo and his co-defendants developed a scheme to defraud Canada of excise tax revenues.  While operating in

upstate New York, they placed large liquor orders "through interstate telephone calls, facsimiles, and wire transmissions" to a wholesaler in Maryland.  <u>Trapilo</u>, 130 F.3d at 549.  After taking delivery of the product, defendants "transported the liquor across the St. Lawrence River and into Canada, avoiding Canadian customs" and the obligation to pay the taxes due to that jurisdiction.  <u>Id.</u>

The district court had dismissed the indictment, "conclud[ing] that it could not determine whether the defendants had the requisite intent to defraud without first passing on the validity of foreign revenue law," <u>id.</u> at 551, an exercise, the district judge believed, would have run afoul of the "revenue rule," i.e. a rule which "bars suit in one country to enforce another country's tax laws."  <u>Pasquantino v. United States</u>, 544 U.S. 349, 373 (2005); <u>see also</u> <u>Trapilo</u>, 130 F.3d at 550 for more complete explanation of the revenue rule.

In reversing, the Circuit explained:

> These cases teach [referencing precedent, primarily in the Second Circuit], as the statute plainly states, what is proscribed is use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property.  Nothing more is required.  The identity and location of the victim, and the success of the scheme, are irrelevant.

<u>Trapilo</u>, 130 F.3d at 552 (emphasis omitted).

Gilboe was a citizen of Norway and resident of Hong

Kong employed as the general manager of a Hong Kong ship brokerage firm. In that capacity, he misrepresented to a Chinese corporation that he had ships available to transport grain, thereupon the parties entered into a contract for that purpose. Defendant then "obtained [the necessary] ships through negotiations with the Manhattan office of a shipowner, using telex and telephone communication channels." Gilboe, 684 F.2d at 237. The grain was to be loaded and transported via two ships, one from Argentina and the other from the United States.

When the grain was loaded in Argentina, the Chinese corporation paid defendant a sum in excess of $600,000 as required under their contract. From that account, "defendant was supposed to pay the shipowner 90% of the agreed freight due." Id. But instead of paying the shipowner, defendant transferred the bulk of the money "to a bank in the Bahamas using the Manhattan branch of Barclays Bank International." Id.

With respect to the shipments from the United States, defendant engaged in the same practice, this time routing the monies received from the Chinese corporation "through Manhattan banks to accounts in the Bahamas." Id. at 238.

Following his conviction, Gilboe argued that the district court lacked jurisdiction over the offense charged "because he was a nonresident alien whose acts occurred outside the United States and had no detrimental effect within the

United States." _Id._ at 237.  In rejecting that argument, the
Circuit noted that "jurisdiction under § 1343 [wa]s satisfied by
defendant's use of the wires to obtain the proceeds of his
fraudulent scheme" at the expense of the shipowners and Chinese
corporation.  _Id._ at 238.

In addition to the three cases cited by the government
there are a number of other cases of interest, the most
important of which is _Pasquantino_, 544 U.S. 349.  Pasquantino
was convicted of violating § 1343 by engaging in essentially the
same scheme as Trapilo and his cohorts, previously discussed.[19]
Akin to Trapilo, Pasquantino "while in New York, ordered liquor
over the telephone from discount package stores in Maryland."
_Id._ at 353.  His drivers then drove to Maryland, picked up the
product, and returned to New York.  Some of the liquor remained
in New York, with the remainder being shipped into Canada
without "paying [the required excise taxes] by hiding the liquor
in their vehicles and failing to declare the goods to Canadian
customs officials."  _Id._

The central issue before the Supreme Court in
_Pasquantino_, like before the Second Circuit in _Trapilo_, involved

---

[19]  Certiorari was granted in _Pasquantino_ to resolve a
circuit split between the Second Circuit's holding in _Trapilo_ and
the First Circuit's contrary holding in _United States v. Boots_,
80 F.3d 580, 587 (1st Cir. 1996)(holding that a scheme to defraud
a foreign nation of tax revenue does not violate the wire fraud
statute).

the "revenue rule" and whether § 1343 should be applied to
frauds directed at evading foreign taxes.[20]  After answering that
threshold question in the affirmative, the Court turned its
attention to Justices Ginsberg's and Breyer's criticism in
dissent that the majority opinion "ascribed an exorbitant scope
to the wire fraud statute, in disregard of [the Court's]
repeated recognition that 'Congress legislates against the
backdrop of the presumption against extraterritoriality.'"  Id.
at 373 (citations ommitted).  To that criticism, Justice Thomas,
delivering the majority opinion, responded:

> [O]ur interpretation of the wire fraud
> statute does not give it 'extraterritorial
> effect.'  Petitioners used U.S. interstate
> wires to execute a scheme to defraud a
> foreign sovereign of tax revenue.  Their
> offense was complete the moment they
> executed the scheme inside the United States
> . . . .

Id. at 371 (internal citation omitted).

In the concluding paragraph of the majority opinion,
the Court notes the jurisdictional breadth of § 1343.

> It may seem an odd use of the Federal
> Government's resources to prosecute a U.S.
> citizen for smuggling cheap liquor into
> Canada.  But the broad language of the wire
> fraud statute authorizes it to do so, and no

_____

    [20]  Parenthetically, the gist of the revenue rule argument
unsuccessfully advanced in Pasquantino was that, as a practical
matter, "the recovery of taxes [wa]s indeed the object of [the]
suit, because restitution of the lost revenue to Canada [was]
required under the Mandatory Victims Restitution Act of 1996, 18
U.S.C. §§ 3663A-3664."  Pasquantino, 544 U.S. at 365.

> canon of statutory construction permits us
> to read the statute more narrowly.  The
> judgment of the Court of Appeals is
> affirmed.

Id. at 372.

> (d)  The Government's Jurisdictional Theory
>      Based Solely on Transfer of Funds Through a
>      New York Correspondent Bank is Insufficient
>      to Establish That Turner's Foreign Conduct
>      Constitutes a Crime Against the United
>      States

It is undisputed that a New York correspondent bank was involved in the transfer of funds from an Australian bank to a bank in the Bahamas at about the time defendant closed shop in the former jurisdiction after being called to task by the ASIC for supposedly marketing securities without a license.  The use of the correspondent bank was necessary given that the Australian bank did not have an account with its Bahamian counterpart whereas the correspondent bank had a relationship with both.  Through a series of electronically made debits and credits, the funds were transferred into Turner's account in the Bahamas.  Turner's involvement in the process ended upon his asking the Australian bank to initiate the process.  (See generally Nov. 14, 2008 Tr. at 33-35 for the positions of the parties as to the agreed-upon role of the correspondent bank.)

It also appears to be undisputed that Turner initiated the fund transfer from Australia to the Bahamas.  Merely because the points of origination and destination were outside of the

United States does not render the transfer per se beyond §
1343's proscription.  <u>Cf.</u> <u>Goldberg</u>, 830 F.2d 459.  And from
<u>Gilboe</u> we know that similarly not fatal to a wire fraud
prosecution is the foreign location of both the victim and the
defendant.  However, for the transfer to be criminal, it had to
be related to, and in furtherance of the scheme to defraud.
<u>Schmuck</u>, 489 U.S. at 710-11; <u>Maze</u>, 414 U.S. at 399-400; <u>United
States v. Fermin Castillo</u>, 829 F.2d 1194 (1st Cir. 1987); <u>United
States v. McNeill</u>, 728 F.2d 5, 14-15 (1st Cir. 1984).  On the
information provided, that seems to be generally the case in
that a continuation of the ongoing scheme required defendant to
extricate his funds from Australia and the problems he faced
there for use in his then new site of operations.  However, to
the extent individuals were defrauded prior to Turner's first
use of American wires, does <u>Maze</u>, as previously discussed,
preclude the corresponding losses from being included for
guideline calculation purposes?[21]

     The core issue as to the government's transfer
jurisdictional theory based solely on Turner's use of a New York
correspondent bank to move his funds from Australia to the

---

[21]  The issues underlying the above question, and some others
broached both <u>supra</u> and <u>infra</u> in the text, have not been
addressed by the parties nor previously raised by the Court <u>sua
sponte</u>.  To the extent the parties have not been heard on such
issues, I will hear counsel at the <u>Fatico</u> hearing or, in some
instances, prior thereto via written submissions as directed
later in this opinion.

Bahamas is encapsulated in the following oral argument excerpt:

> MR. NEVILLE [defense counsel]: And I say
> that's [i.e. the fund transfer from
> Australia and the Bahamas through a New York
> correspondent bank] not enough of a nexus to
> give this Court jurisdiction. And I
> couldn't find any case law that would
> support the government's argument [and
> presumably none that would refute it
> either].
>
> THE COURT: So it's a question of the
> sufficiency of the nexus rather than the
> presence or absence of the nexus?
>
> MR. NEVILLE: I think we have to say that,
> yes.

(Nov. 14, 2008 Tr. at 35.)

> Query: Would the subject wire transfer be
> sufficient to sustain a prosecution under §
> 1343 assuming a concomitant scheme to
> defraud vis-a-vis one or more of Turner's
> foreign victims?

Although the matter is certainly not free from doubt,

I think the answer to that question is "no." That single nexus

under the first scenario of the government's two-pronged

jurisdictional argument is insufficient. Absent the additional

factors embodied in the government's alternate jurisdictional

argument — such as Turner's commingling and use of domestic and

foreign monies in the Ponzi scheme — the reed proffered by the

government is simply too thin.

In reaching that conclusion, I recognize that the

Second Circuit over thirty years ago in Gilboe held that wire

fund transfers consisting simply of "'electronic crediting and

-47-

debiting'" constituted "'money'" for purposes of a prosecution based on 18 U.S.C. § 2314 which prohibits, inter alia, transfers in interstate or foreign commerce of funds obtained by fraud. Gilboe, 684 F.2d at 238. However, that determination was made in the context of a significant domestic concern, to wit, Gilboe's need "to move funds rapidly out of reach of disgruntled [Manhattan] shipowners who were to receive payment within days of loading the grain." Gilboe, 684 F.2d at 238; see also id. at 237 indicating that the defrauded parties included "Manhattan shipowners." Also in Goldberg, the Third Circuit, as noted earlier, underscored the impact that the foreign conduct was intended to produce domestically. Goldberg, 830 F.2d at 462. Here, Turner's defrauding of Knight and other foreign investors was not aimed at, nor did it cause any harm in the United States. And independent of Turner's later defrauding of Americans, our interest in Turner, who throughout the scheme's existence operated abroad as a foreign citizen and resident, was nonexistent.

I also considered the following, earlier quoted excerpt from Trapilo:

> [A]s the statute plainly states, what is
> proscribed is use of the telecommunication
> systems of the United States in furtherance
> of a scheme whereby one intends to defraud
> another of property. Nothing more is
> required. The identity and location of the
> victim . . . are irrelevant.

-48-

130 F.3d at 552 (emphasis omitted).

That portion of the Trapilo holding obviously dovetails with the concomitant facts.  But those facts entail the placing of orders for liquor "through interstate telephone calls, facsimiles and wire transmissions" from upstate New York, not the incidental use of a correspondent bank in effecting a transfer between two foreign countries.  Id. at 549.  Similarly, Kim, another jurisdictional case relied upon by the government, did not involve peripheral contact, through a correspondent bank or otherwise, with our telecommunication systems.

Moreover, the Supreme Court in Pasquantino responded to the dissent's concern about the "extension of the 'wire fraud' statute . . . to a scenario extraterritorial in significant part [although the statute is s]ilent on its application to activity culminating beyond our borders," Pasquantino, 544 U.S. at 372, by explaining that "our [i.e. the majority opinion] interpretation of the wire fraud statute does not give it 'extraterritorial effect[]'" [because defendants'] offense was complete the moment they executed the scheme inside the United States." Id. at 371.  That scheme, hatched and implemented in upstate New York, involved "telephone calls between New York and Maryland." Id. at 373.

If the extraterritorial scope of § 1343 were as categorical as the government contends and as a non-contextual

reading of the above quote from _Trapilo_ suggests, presumably the
Supreme Court would have simply indicated that the identity and
location of the victim is irrelevant for purposes of § 1343
rather than providing the explanation that it did.  _See_
_generally_ Ellen S. Podgor, _A New Dimension to the Prosecution of_
_White Color Crime: Enforcing Extraterritorial Social Harms_, 37
McGeorge L. Rev. 83, 92 (2006)("The _Pasquantino_ decision also
does not resolve whether extraterritorial concerns can be
considered in cases involving the application of federal
statutes to social harms that occur outside the United States.
Although it alluded to wire fraud having an extraterritorial
application because of the language of the statute including the
words 'interstate or foreign commerce,' it also noted that the
issue of extraterritoriality is a novel theory of a two-person
dissent on an issue that the government did not have the
opportunity to brief.").  And finally there is nothing to my
knowledge to suggest that the Congress in enacting § 1343, and
amending the statute in 1956 to explicitly cover foreign
commerce, intended for its application to situations in which
the sole domestic contact consists of a transfer between two
foreign countries essentially ricocheting off the United States
via the happenstance of a domestic correspondent bank being
involved.  Given that literally thousands, if not millions of
such domestic correspondent bank contacts occur daily, a

determination that such use, alone, if coupled with a foreign scheme to defraud, could constitute a predicate for a § 1343 prosecution, would extend the extraterritorial reach of the statute exponentially without any corresponding interest of the United States being advanced.  It is not surprising that none of the cases cited by the parties or by in-chambers research has uncovered a reported decision in which jurisdiction has been claimed, no less established, on grounds comparable to those urged by the government under its first jurisdictional argument.

In sum, the government's argument that the defendant's transfer of funds from Australia to the Bahamas through a New York correspondent bank is per se sufficient to make his defrauding of foreign investors prosecutable under § 1343 is found to be without merit.  However, the situation is otherwise when the government's proffer regarding the commingling of funds and subsequent use of those funds is factored into the analysis.

> (e) Government's Jurisdictional Theory
>     Based on Transfer Through New York
>     Correspondent Bank Plus, Inter Alia,
>     the Commingling and Use of Funds
>     From Domestic and Foreign Investors
>     Thereafter, is Sufficient to Establish
>     That Turner's Conduct Constitutes a
>     Crime Against the United States, Assuming
>     the Disputed Facts are as the Prosecution
>     has Represented

The government's previously provided listing of the claimed nexus between defendant's domestic and foreign activities (supra at 16-18), submitted primarily with respect to

its inextricably intertwined theory, was found to be inadequate to support that theory. However, several of those items, when viewed in conjunction with the involvement of a United States correspondent bank in the fund transfer from Australia to the Bahamas, compels a different result.

It appears that Turner's scheme began in the late 1990s in Australia and moved to the Bahamas in 2000. (Feb. 16, 2006 Stip. as to Knight's Testimony ¶¶ 6 to 9). "In October 2000, Turner solicited his first victim in the United States," using the same modus operandi. (Gov't's Aug. 8, 2008 Letter Br. at 12.) The counts of conviction for the three American John Does cover the period from February 2001 to April 16, 2005.

The entry of Americans into the victim ranks beginning in late 2000 altered the scheme from one solely involving extraterritorial concerns to one implicating significant domestic interests as well. To the extent funds derived from American victims were utilized to, among other things, make distributions to foreign victims and vice versa, we, as a nation, have a legitimate interest in protecting our residents against Turner's conduct. The same may be said of Turner's use of commingled funds in the Bahamas to compensate United States sales personnel marketing his scheme domestically. In each instance, the conduct abroad was intended to have effects in the United States. As such, that conduct considered together with

Turner's use of a New York correspondent bank to transfer funds from Australia to New York, would be prosecutable under § 1343 thereby satisfying <u>Azeem's</u> "crime against the United States" standard. <u>See</u> <u>Goldberg</u>, 830 F.2d at 462 ("[W]e find precedent for extending the jurisdiction of the federal courts to include offenses, wholly committed outside of this country, if the acts committed are intended to have an effect in the United States.") and <u>United States v. Braverman</u>, 376 F.2d 249, 251 (2d Cir. 1967)("Braverman knew, when he cashed the money orders [at a money exchange firm in Brazil] and gave Miranda two . . . , that he was putting them into foreign commerce because, of necessity, they had to be ultimately paid in Brooklyn, New York.").

Indeed, defendant seemingly does not dispute the above conclusion if it is assumed that the government's proffer represents reality. But, the defense maintains, such is far from the case. Thus, in responding to the government's commingling argument, defense counsel stated: "Your Honor, I think the government's argument would hold water if it were true. I think factually the government is misrepresenting what occurred here." (Nov. 14, 2008 Tr. at 22-23.) That leads us to the next section of this opinion. For purpose of addressing the first two unsuccessful theories put forth by the government, viz. inextricably intertwined and jurisdiction predicated on the transfer of funds alone, I assumed, arguendo, the facts to be as

the prosecution has represented. So construed, the government's arguments still fell short of the mark. However, for the government to prevail on its transfer plus jurisdictional theory, it must establish that its rendition of the pivotal facts is accurate.

10. Government's Burden of Proof as to § 1B1.3(a)(2)
    Under its Transfer Plus Jurisdictional Theory

The government has the burden of establishing by a fair preponderance of the evidence that defendant's foreign conduct should be included as relevant conduct under § 1B1.3(a)(2). To meet that burden under its transfer plus jurisdictional theory, the government should be prepared to prove at a <u>Fatico</u> hearing the following:

(1) with respect to each foreign victim the government seeks to have included in the guideline calculations: (a) that such person was indeed a "victim" under our law and the law of the relevant foreign jurisdiction,[22] (b) that such victimization was part of the same course of conduct or common scheme as the counts of conviction, (c) the amount of loss sustained, adjusted for the exchange rate, together with an explanation of the date used in making that calculation, and (d)

_____

[22] Fed. R. Crim. Proc. 26.1 provides: "A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice. Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source--including testimony-- without regard to the Federal Rules of Evidence."

why Knight's loss and that of other foreign investors said to have been defrauded prior to Turner transferring funds from Australia to the Bahamas should be included in the guideline calculations;

(2) that the defendant brought about the transfer of funds from Australia to the Bahamas through a correspondent bank in the United States (see the government's factual proffer, item "a", supra at 16-17);[23]

(3) that the monies obtained by defendant from foreign and domestic victims were commingled after his operation expanded to include United States investors (see id. item "c", supra at 17);

(4) the commissions were paid from commingled funds to sales personnel in the United States perpetrating the scheme domestically (see id. item "d", supra at 17); and

(5) that the commingled funds, given the nature of the ongoing Ponzi scheme, resulted in monies obtained from domestic victims being applied towards payments to foreign investors and vice versa (see id. item "h", supra at 18).[24]

---

[23] As stated earlier in the text, this item is not in dispute.

[24] Heretofore in the text, the initial subdivisions of each numbered section of the opinion has been designated by letters beginning with "a". However for this subdivision, viz. "10", I have used numbers "1" through "5" because otherwise the cross-references to the earlier presented listing of government's factual proffers is difficult to follow.

Some of the other items contained in the government's list of factual proffers are relevant for present purposes because, if established, they provide further support for its transfer plus jurisdictional theory. Included within that category are items "b" (foreign victims sending monies to the Bahamas through United States correspondent banks), "e" (pertaining to Turner's trading room in the Bahamas having plasma screens leased from Bloomberg in the United States using commingled funds), and "g" (pertaining to Turner having investment brochures manufactured in the Eastern District of New York, again paid for with commingled funds).[25] In addition, scores of wire fund transfers occurred between the United States and the Bahamas and vice versa "between the period of February, 2003 to December 9, 2004," further buttressing this government theory. (Def.'s Oct. 30, 2008 Letter Br. at 4-5.)

The circumstances leading to the transfer of funds from Australia to the Bahamas via a New York correspondent bank may also be germane to the extent the government seeks to have the number of foreign victims, and their associated losses

---

[25]   With respect to item "f" pertaining to Turner establishing a trading account in November 2000 at R.J. O'Brien in Chicago with monies realized from his fraudulent scheme, the government acknowledged during oral argument, as previously noted, that that account played no role in advancing the scheme. Accordingly the funding of that account has no more relevance for § 1B1.3(a)(2) purposes than if Turner, for instance, had used the ill-gotten proceeds to buy an automobile in the United States.

included in the guideline calculations.  <u>Maze</u> instructs that if
a scheme to defraud has fully run its course before the mailing
relied upon by the government occurs, the mailing is not
sufficient to establish a violation of § 1341.  However, if the
wire transfer here occurred to prevent Knight and other early
investors from discovering Turner's wrongdoing and/or recovering
their outlays pursuant to his purported agreement with the ASIC
to repay all his investors,[26] or for some other reason geared to
a continuation of the fraud, then a different result would
presumably follow.

        It must be remembered that the foreign conduct must be
criminal to be relevant for § 1B1.3(a)(2) purposes.  <u>See</u> <u>supra</u>,
n.2.  Such conduct need not only be criminal under our laws, but
also under the laws of the country where the acts occurred.  <u>See</u>
<u>Azeem</u>, 946 F.2d at 17 ("Were a global approach required, we
would soon find it necessary to determine the appropriate
evidence that must be produced by the prosecution to show that
the activity occurred and that it violated foreign law."), and
<u>Goldberg</u>, 830 F.2d at 462 ("[T]he general and almost universal
rule is that the character of an act as lawful or unlawful must
be determined wholly by the law of the country where the act is

---

        [26] (<u>See</u> Gov't's Aug. 8, 2008 Letter Br. at 2 for a more
complete explanation of the government's understanding of what
supposedly transpired between defendant and the ASIC.)

done.").[27]

CONCLUSION

For the reasons indicated:

(1) the Court agrees with the government's position advanced during oral argument that if Turner's foreign conduct could have been prosecuted domestically given the breadth of § 1343, then the _Azeem_ requirement of such foreign conduct being a crime against the United States is satisfied for purposes of § 1B1.3(a)(2);

(2) the Court rejects the government's argument that foreign conduct should be considered under § 1B1.3(a)(2) because the foreign and domestic portions of the scheme are allegedly inextricably intertwined, as well as the government's theory urging the same result based solely on Turner's transfer of funds from Australia to the Bahamas via a New York correspondent bank; and

(3) the Court accepts the government's "transfer plus jurisdictional theory," as earlier explained, subject to possible revisiting or modification (a) should the government

---

[27] Foreign conduct, if it was prosecutable here, need not mirror the counts of conviction to be relevant under § 1B1.3(a)(2) as long as such wrongdoing is proven to be part of the same scheme or course of conduct as the counts of conviction. Thus, for example, if a foreign victim was not induced to invest via a mailing or wire, unlike his or her domestic counterparts — as defendant suggests was true of Knight (see item "d" of "Defendant's Position" supra at 21), that is not dispositive of the relevant conduct issue. Cf. Fitzgerald, 232 F.3d at 320.

not prove at a _Fatico_ hearing one or more of the items listed in paragraph 10 _supra_, entitled "Government's Burden of Proof as to § 1B1.3(a)(2) Under its Transfer Plus Jurisdictional Theory," and/or (b) based on the Court's resolution of the open, heretofore unaddressed issues identified _supra_.

The most significant of the previously unaddressed issues is whether the Trailing Clause of § 1B1.3(a)(1) should be included in applying § 1B1.3(a)(2) as the Second Circuit indicated in _Fitzgerald_. As to that issue, as well as the question concerning victims defrauded prior to the fund transfer from Australia to the Bahamas, each party shall submit its position by June 5, 2009, with any responses to the other's submission being due on June 26, 2009. Those issues shall be the subject of oral argument and decision on July 9, 2009. Thereafter an updated Presentence Report will be ordered and a resentencing date set.

SO ORDERED.

Dated: Central Islip, New York
       May 4, 2009

_____/S/_____
DENIS R. HURLEY, U.S.D.J.